# In the United States Court of Federal Claims

CELERAPRO, LLC,

                Plaintiff,

                v.

THE UNITED STATES,

                Defendant.

No. 23-cv-808

Filed Under Seal: November 3, 2023

Publication: November 14, 2023[1]

*Lewis P. Rhodes* of Reston Law Group LLP, Reston, VA argued for Plaintiff. With him on the briefs was *Thomas K. David* of Reston Law Group LLP, Reston, VA.

*Mariana Teresa Acevedo*, United States Department of Justice, Civil Division, Washington, DC argued for Defendant. With her on the briefs were *Brian M. Boynton*, Principal Deputy Assistant Attorney General, Washington, DC; *Patricia M. McCarthy*, Director, Commercial Litigation, Washington, DC; *Franklin E. White, Jr.*, Assistant Director, Commercial Litigation, Washington, DC; *Carolyn Tolman* and *Jeffrey Renshaw*, National Aeronautics and Space Administration (NASA) Stennis Space Center, Of Counsel; and *Rosalind Cylar* and *Vince Vanek*, NASA Marshall Space Flight Center, Of Counsel.

## MEMORANDUM AND ORDER

    Plaintiff CeleraPro, LLC (CeleraPro) filed this bid protest action against Defendant United States, challenging the National Aeronautics and Space Administration's (NASA's) award of a sole-source task order contract for administrative support services at NASA's Marshall Space Flight Center (MSFC) and Michoud Assembly Facility (MAF).[2] Specifically, CeleraPro contends

---

[1] This Memorandum and Order was filed under seal in accordance with the Protective Order entered in this case (ECF No. 8) and was publicly reissued after incorporating all appropriate redactions proposed by the parties (ECF No. 34). The sealed and public versions of this Memorandum and Order are otherwise substantively identical, except for the publication date, the correction of minor typographical errors, and this footnote.

[2] MAF is owned and managed by MSFC. *Michoud Assembly Facility*, NASA, https://www.nasa.gov/michoud-assembly-facility/ (last visited Nov. 2, 2023). For consistency and in accordance with the parties' briefs, this Memorandum and Order references MSFC to represent both locations.

that NASA's task order award to the holder of an existing single-award, indefinite-delivery, indefinite-quantity (IDIQ) contract titled the Dual Administrative Support Services (DASS) contract is arbitrary, capricious, and contrary to law because the task order purportedly materially departs from the scope of the original procurement.  Accordingly, as Plaintiff alleges that the award violates the Competition in Contracting Act (CICA), it seeks (1) a declaration that NASA's intention to procure such administrative support services via a task order under the DASS IDIQ is arbitrary, capricious, and contrary to law, and instead must be bid competitively; and (2) a permanent injunction of this task order award under the DASS IDIQ contract.  Plaintiff's Bid Protest Complaint (Pl. Compl.) at 5.[3]

After considering the parties' arguments as presented in briefing and during the September 19, 2023 Oral Argument, the Court rules in part for the Plaintiff and in part for the Defendant.  For the reasons discussed below, Defendant's Motion to Dismiss for lack of standing (ECF No. 25) is **DENIED**, Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 11) is **DENIED**, and Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 25) is **GRANTED**.

## BACKGROUND

### I.    The Parties

CeleraPro is an SBA HUBZone small business that provides administrative support services.[4]  Compl. ¶ 5.  CeleraPro is currently the incumbent contractor providing administrative

---

[3] Citations throughout this Memorandum and Order to the Administrative Record correspond to the pagination within that document.  Citations to all other documents, including briefing and exhibits, reference the ECF-assigned page numbers, which do not always correspond to the pagination within the document.

[4] The nature of the work for the contracts at issue in this case is not in dispute.  Plaintiff CeleraPro's Motion for Judgment on the Administrative Record (ECF No. 11) (Pl. MJAR) at 6 n.1 ("There is no dispute that the DASS, CASS [II] and other contracts involved in this matter all involved

support services at the location at issue, NASA's MSFC in Huntsville, Alabama. *See* Plaintiff's Response to Defendant's Motion to Dismiss or for Judgment on the Administrative Record (ECF No. 26) (Pl. Response) at 5; Pl. MJAR at 7. NASA contracted for these services under the Center Administrative Support Services II (CASS II) Contract, a 100% HUBZone set-aside contract NASA solicited in September 2020, and awarded to Plaintiff after a competitive bid process. Pl. MJAR at 7; Administrative Record (ECF Nos. 10, 18) (AR) at 1, 919.

NASA is a federal government agency responsible for scientific and technical advancements relating to earth and space technologies.[5] With over 20 centers and facilities, NASA "conduct[s] research, testing, and development to advance aeronautics."[6] In order to facilitate this mission, NASA hires contractors to provide administrative support services at its several locations.

## II.   NASA's Effort to Consolidate Services Under its Mission Support Future Architecture Program (MAP)

In 2017, NASA created the Mission Support Future Architecture Program (MAP), with the goal of "centralizing support services at the agency level," instead of employing independent support services at "specific space centers or operating locations." Defendant's Motion to Dismiss, or, in the Alternative, Motion for Judgment on the Administrative Record, and Response to Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 25) (Def. Mot. Dismiss) at 9; *see also id.* at 10–11. Such centralization was intended to increase efficiency, effectiveness, and consistency across NASA. *Id.* at 9–10.

In 2018, in accordance with MAP, NASA began the process of specifically centralizing

---

general administrative support with similar labor categories."). For consistency and in accordance with the parties' briefs, this Memorandum and Order references all relevant work as "administrative support services."

[5] *About NASA*, NASA, https://www.nasa.gov/about/ (last visited Oct. 10, 2023).

[6] *Id.*

administrative support services at the agency level.  AR at 8186.  In November 2018, NASA Headquarters (NASA HQ) directed two of its Space Flight Centers, Stennis Space Center (SSC) and Johnson Space Center (JSC), not to renew their individual administrative contracts "as the agency considered ways to strategically acquire [Administrative Clerical Support Services] and create/award an enterprise contract suitable for use by the entire agency in support of Mission Support Future Architecture Program (MAP)."  AR at 8186.

In NASA's implementation of MAP, "NASA organized support services by region."  Def. Mot. Dismiss at 11–12.  The region relevant to this action is the Space Flight Region which includes: (1) Texas (JSC); (2) Florida (KSC); (3) Alabama (MSFC); and (4) Mississippi (SSC). *Id*.  Each of these locations is a Space Flight Center in the Space Flight Region.

### III.    The DASS Solicitation and Award

In October 2019, NASA held a Procurement Strategy Meeting to "[a]uthorize the Procurement Strategy for and obtain authority to proceed with the DASS procurement."  AR at 8119, 8125.  The proposed DASS contract included a 5-Year Base Period, to "allow[] for flexibility during MAP transitioning should the government require additional time," and "[s]hould the contractor be unable to perform, . . . allow[] the Government adequate time to re-compete the effort."  AR at 8137.  As explained by Defendant, "[p]rior to the implementation of MAP, each space center procured its own support services" and thus, "[t]he DASS contract was the first attempt to implement MAP cost savings and efficiencies."  Def. Mot. Dismiss at 12.

In November 2019, again with reference to MAP, NASA approved the consolidation of JSC's and SSC's administrative support services under one contract, DASS, documenting its decision in a written memorandum from the NASA Office of Procurement.  DASS Written Determination Concerning Consolidations Required by Federal Acquisition Regulation (FAR) 7.107 (DASS Consolidation Determination) AR at 8185–90.  The DASS Consolidation

Determination included market research, alternatives considered by NASA, and NASA's decision to make DASS an 8(a) set-aside.  AR at 8185–90.

In February 2020, NASA issued its Solicitation for the DASS contract.  AR at 8191–261. DASS is a single award IDIQ Contract, with a 100% set-aside for 8(a) businesses.  AR at 8192; Def. Mot. Dismiss at 12 ("DASS . . . is an 8(a) set-aside for which only 8(a) businesses may compete . . . .").  The Request for Proposal (RFP), Section 1.3, or the Place of Performance – Services, states the following:

> The Contractor shall perform the work under this contract at the Government's site, defined as the Stennis Space Center (SSC), Johnson Space Center (JSC) (including Government maintained facilities in the immediate JSC area (including the Sonny Carter Training Facility and Ellington Field)), the White Sands Test Facility located in Las Cruces, New Mexico.  The Contractor may be required to perform services at other NASA operating locations or alternate work locations not currently specified.  In the event services are required at other NASA operating locations or alternate work locations the Government and the Contractor shall negotiate the Fully Burdened Rates (FBR) for the location.[7]

AR at 8195.[8]

---

[7] All locations expressly referenced in Section 1.3, aside from SSC, are JSC or JSC-related locations.  At Oral Argument, the Court requested Defendant file a Notice explaining whether the locations identified in Section 1.3 apart from SSC, are the only NASA locations associated with JSC.  Oral. Arg. Tr. at 64.  In its Notice, Defendant responded, "Yes. The JSC Contracting Officer has verified that the locations identified in Section 1.3 of the RFP are the only locations supported by JSC, 'Johnson Space Center (JSC) (including Government-maintained facilities in the immediate JSC area (including the Sonny Carter Training Facility and Ellington Field)), [and] the White Sands Test Facility located in Las Cruces, New Mexico.' There is a NASA Forward Operation Location in El Paso, Texas, but it is not considered to be supported by JSC because it is a leased hanger at the El Paso International Airport."  Defendant's Response to the Court's Questions Posed at Oral Argument (ECF No. 29) (Def. Notice) at 1.

[8] Section 1.0 of the DASS Solicitation Statement of Work (SOW) contains similar language and is also cited by both parties: "The Statement of Work (SOW) describes the products and services to be provided by the Contractor to NASA at the Government's sites, defined as the Johnson Space Center (JSC), and Government-maintained facilities in the immediate JSC area (including the Sonny Carter Training Facility and Ellington Field), the White Sands Test Facility (WSTF) located in Las Cruces, New Mexico, and the Stennis Space Center (SSC), MS. In the event services are

In total, 37 offerors bid on the DASS contract.  AR at 895.  On September 4, 2020, NASA awarded the DASS contract to CBF Partners JV.  Pl. MJAR at 7; Def. Mot. Dismiss at 12; AR at 887, 890.

Following the award, administrative support services for JSC and SSC were provided by way of task orders under the DASS contract.  *See* Def. Mot. Dismiss at 34; AR at 8175 ("Services will be performed via task orders . . . ."); AR at 894 ("SSC and JSC independently issue task orders against the DASS contract to fulfill their administrative services requirements.").

## IV.    The CASS II Contract Solicitation and Award

Following the award of the DASS contract for JSC and SSC to CBF Partners JV, Kennedy Space Center (KSC) and MSFC remained under separate administrative support contracts.  In September 2020, NASA issued a Solicitation for the CASS II contract, intended to support NASA's MSFC location.  Pl. Compl. at 3; AR at 1.  Unlike DASS, CASS II was deemed a 100% HUBZone small business contract and not an 8(a) set-aside.  AR at 1, 919.  The CASS II contract included the potential for five years of performance, with a 12-month base period and four additional 1-year option periods at NASA's unilateral election.  AR at 919–21.  On July 14, 2021, the CASS II contract was awarded to Plaintiff CeleraPro.  Def. Mot. Dismiss at 12.

## V.    NASA Decides to Add KSC to the DASS Contract

In February 2021, NASA evaluated whether a proposed modification to the DASS contract to include administrative support services at KSC would "trigger[] the competition requirements in the Competition in Contracting Act (CICA)."[9]  80SSC020D0002 – Scope Determination (KSC

---

required at other NASA operating locations or alternate work locations the Government and the Contractor shall negotiate the fully burdened rate (FBR) for the location."  AR at 876.

[9] The Scope Determination includes the signature of NASA's Contracting Officer.  AR at 889.

Scope Determination) AR at 887–89.  The KSC Scope Determination details that in January 2021,

the Director of the Office of Procurement, Langley Research Center, inquired about the possibility

of adding KSC's administrative support service requirements—set to expire in February 2022—

to the DASS contract.  AR at 887.  NASA sought the proposed modification based upon MAP,

which as noted above, sought to consolidate administrative support services.  AR at 887 ("[A]s a

result of Mission Support Future Architecture Program (MAP), the intent is to move the

administrative services requirement from KSC's KISS IV contract when it expires on February

28, 2022, to the DASS contract.").

> NASA considered the following in its analysis of the KSC Scope Determination:
>
> 1. To determine if the change is within the general scope of the DASS contract,
>    we must determine if, prior to award, the solicitation adequately advised
>    offerors of the potential for the change or offerors reasonably could have
>    anticipated this type of contract change based upon what was in the solicitation
>    . . . .
>
> 2. To determine whether a modification triggers the competition requirements in
>    the Competition [i]n Contracting Act (CICA), we must decide if there is a
>    material difference between the modified contract and the contract that was
>    originally awarded. Evidence of a material difference between the modification
>    and the original contract is found by examining any changes in the type of work,
>    performance period, and the cost between the contract as awarded and as
>    modified.

AR at 888.  The KSC Scope Determination concluded offerors were adequately advised or could

have anticipated the addition of KSC because Section 1.0 of the DASS Statement of Work (SOW)

states that "[i]n the event services are required at other NASA operating locations or alternate work

locations the Government and the Contractor shall negotiate the fully burdened rate (FBR) for the

location."  AR at 888 (citing Section 1.0 of the DASS SOW, AR at 876).  In assessing whether the

addition of the proposed modification triggered CICA, NASA found the type of work to be similar,

the period of performance to be within the scope of the DASS performance period, and the

estimated cost of the addition of KSC to be a change of "$20,000,000 [], or 26 percent of the contract ceiling of $76,000,000."[10]  AR at 889.  Accordingly, NASA concluded that its decision to consolidate KSC into DASS did not violate CICA.  AR at 889 ("The modification does not materially alter the contract that the field of competition for the contract, as modified, would be significantly different form that obtained for the original contract, as awarded.").

In August 2021, NASA's Office of Procurement further documented its decision in a consolidation determination.  *See* Dual Administrative Supportive Services (DASS), Written Determination Concerning Consolidations Required by Federal Acquisition Regulation (FAR) 7.107[11] (KSC Consolidation Determination) AR at 893.  According to NASA, the purpose of the KSC Consolidation Determination was to "contemplate[] consolidating the administrative services portion of Kennedy Space Center's Institutional Support Services IV (KISS IV) into DASS."[12] AR at 893.  NASA references MAP multiple times in its analysis.  *See* AR at 896 ("In accordance with the Mission Support Future Architecture Program (MAP), the proposed action is to move the administrative services requirement . . . to the DASS contract."); AR at 898 ("An alternative contracting approach to consolidation of contract requirements is the solicitation and award of a separate contract for KSC's administrative services.  The planned consolidated action will be substantially more beneficial than the alternative approach since a separate contract for KSC's

---

[10] In its scope determination, NASA notes: "While the percent increase appears high, cost alone does not dictate whether the modification is beyond the scope of the contract."  AR at 889.

[11] The KSC Consolidation Determination was reviewed by NASA's Contracting Officer, SSC Small Business Specialist, Office of the General Counsel at SSC, Procurement Officer, Cognizant Office of Small Programs Program Manager, Associate General Counsel for Procurement Law HQ Office of the General Counsel, and Senior Procurement Executive.  AR at 899–900.

[12] In its findings, NASA also explains that instead of re-procuring an administrative support contract at KSC, NASA planned for KSC to be a sole source modification issued under the DASS contract by way of task order.  AR at 894.

requirement will not further NASA's goals for MAP, will not allow the efficiencies related to award under the existing DASS contract, and may realize little or no cost savings."). The KSC Consolidation Determination ultimately concluded it was in the best interest for NASA to consolidate KSC into DASS. AR at 898 ("[T]his consolidation is necessary and justified.").

## VI.    Subsequent NASA Action

### A.    NASA's Updated FAR Supplement to Consolidate a Sole Buying Location

In February 2023, NASA amended the NASA Supplement to the Federal Acquisition Regulation (FAR) to designate SSC as the buying location for the entire Space Flight Region.[13] Def. Mot. Dismiss at 12–13 (citing 48 C.F.R. Chapter 18, Appendix A at A-22, A-102.25(a)(1)); *see also supra* Section II (explaining that in accordance with MAP, the region relevant for this action is the Space Flight Region which includes: (1) Texas (JSC); (2) Florida (KSC); (3) Alabama (MSFC); and (4) Mississippi (SSC)). As of the February 2023 amendment, DASS covered the administrative support services for JSC, KSC, and SSC.

### B.    The Proposed Inclusion of MSFC & MAF Locations under the DASS Contract

In March 2023, NASA again considered whether a proposed modification to the DASS contract would "trigger[] the competition requirements in the Competition in Contracting Act (CICA)," but this time for the proposed addition of MSFC under the DASS contract.[14] 80SSC020D0002 – Scope Determination (MSFC Scope Determination) AR at 890–92. The

---

[13] The February 2023 revision to NASA's NFS Appendix A was not codified in the Code of Federal Regulations (CFR) or subject to public comment. *Revision to NFS Appendix A, Enterprise Procurement Strategies*, NASA (Feb. 6, 2023) at 3, https://www.hq.nasa.gov/office/procurement/regs/pn/pn23-02.pdf ("These changes do not have a significant effect beyond the internal operating procedures of NASA and do not have a significant cost or administrative impact on contractors or offerors, and therefore do not require codification in the Code of Federal Regulations (CFR) or publication for public comment.").

[14] The Scope Determination includes the signature of NASA's Contracting Officer. AR at 892.

MSFC Scope Determination details that in December 2022, representatives from MSFC, NASA HQ, and SSC met "to discuss moving MSFC Administrative Services requirements to the DASS contract." AR at 890. The analysis of the MSFC Scope Determination largely mirrors that of the KSC Scope Determination, with the same scope determination analysis outlined above. *See supra* Section V. The MSFC analysis concluded "the solicitation adequately advised offerors of the potential for the change or offerors reasonably could have anticipated this type of contract change based upon what was in the solicitation," due to the language of Section 1.0 of the DASS SOW and Section 1.3 Place of Performance – Services of the DASS RFP.[15] AR at 891 (citing Section 1.0 of the DASS SOW, AR at 876; Section 1.3 of the DASS RFP, AR 8195).[16] Similar to the KSC Scope Determination, the MSFC Scope Determination found the type of work to be similar, the period of performance to be within that of the DASS performance period, and the estimated cost of the addition of MSFC to be a change of "$9,957,042.00, or 13 percent of the contract ceiling of $76,000,000."[17] AR at 892. Accordingly, NASA concluded its decision to consolidate MSFC into DASS did not violate CICA. AR at 892 ("The modification does not materially alter the contract that the field of competition for the contract, as modified, would be significantly different from that obtained for the original contract, as awarded."); *see also* AR at 889.

In May 2023, NASA additionally documented a "Determination and Findings (D&F) for Consolidation of Requirements" for MSFC, as NASA had similarly documented for KSC in

---

[15] In the KSC Scope Determination, NASA discussed Section 1.0 of the DASS SOW as well. Section 1.3 of the RFP is included in addition to Section 1.0 in NASA's MSFC Scope Determination. AR at 891; *Supra* Section V.

[16] *Supra* Section III.

[17] In its scope determination, NASA notes: "While the percent increase appears high, cost alone does not dictate whether the modification is beyond the scope of the contract." AR at 892.

2021.[18]   (MSFC Consolidation Determination) AR at 901–10.   The MSFC Consolidation Determination provides, "The proposed contract modification is to add the George C. Marshall Flight Center (MSFC) / Michoud Assembly Facility (MAF) Administrative Support Services requirement to the Dual Administrative Support Services (DASS) contract which currently supports Stennis Space Center (SSC), Johnson Space Center (JSC), Kennedy Space Center (KSC), and the White Sands Training Facility (WSTF)."[19]  AR at 901.  NASA again references MAP and its efficiencies multiple times in its analysis of the MSFC consolidation.   AR at 903 ("In accordance with NASA's Mission Support Future Architecture Program (MAP), the proposed action is to move MSFC/MAF's administrative services requirement from the CASS II contract to the DASS contract upon completion of the current CASS II option period which expires July 31, 2023.  As a result, option periods 2 through 4 of the CASS II contract will not be exercised."); AR at 906 ("The DASS solicitation and contract were structured to implement NASA's MAP plan to transform all mission support services from their current state to an enterprise operating model while maintaining mission focus, improving efficiency, ensuring local authority, and valuing the workforce.  In addition, NASA's Procurement Business Service Assessment (BSA) determined that duplication of both procurement capabilities and procurement instruments across NASA Centers contributed to more administrative actions, redundant processes, and higher costs associated with managing procurement instruments across NASA. Therefore, adding MSFC's

---

[18] The MSFC Consolidation Determination was reviewed by NASA's Contracting Officer, Small Business Specialist, Office of the General Counsel at SSC, Procurement Officer, Associate Administrator, Office of Small Business Programs, Associate General Counsel for Procurement Law HQ Office of the General Counsel, Senior Procurement Executive, and Associate Administrator for the Mission Support Directorate.  AR at 909–10.  The first signature is dated March 2023 and the last in May 2023.

[19] Like KSC, the MSFC Consolidation Determination findings also explain that instead of re-procuring an administrative support contract at MSFC, MSFC would be a sole source modification issued under the DASS contract via task order.  AR at 901–02.

requirement to the DASS contract is consistent with the Agency's MAP goals."); AR at 907 ("An alternative contracting approach to consolidation of contract requirements is the solicitation and award of a new contract for MSFC's administrative services.  The planned consolidated action will be substantially more beneficial than the alternative approach since a new contract for MSFC's requirement will not further NASA's goals for MAP, will not allow for the efficiencies related to award under the existing DASS contract, may realize little or no cost savings, and may result in a lapse in administrative support services at MSFC.").

Like the KSC Consolidation Determination, the MSFC Consolidation Determination ultimately concluded it was in the best interest for NASA to consolidate administrative support services at MSFC into DASS.  AR at 908 ("[T]his consolidation is necessary and justified."); *see also* AR at 898.

### C.    NASA Notifies CeleraPro

On April 13, 2023, NASA's Contracting Officer "document[ed] the Government's decision to not exercise Option Periods 2–4 of the CASS II Contract 80MSFC21DA004."[20]  AR at 582–87.  Subsequently, on April 19, 2023, NASA's Contracting Officer notified CeleraPro of its intent not to exercise option years 2–4 under CASS II.  AR at 588 (explaining that NASA's letter serves as notice of NASA MSFC's "unilateral right to not exercise the remaining options as provided for within the CASS II contract").  Plaintiff does not dispute NASA's decision to forgo exercising its additional option years on the CASS II contract, effectively ending its relationship with CeleraPro for administrative services at MSFC.  Pl. MJAR at 6; Oral Arg. Tr. at 20:11–15.

---

[20] In its Memorandum, the Contracting Officer details several "undoubtably . . . difficult [challenges]."  AR at 582–87 (█████████████████████████████████████ ███████████████████████████████████████████████████████████████████ █████████████████).

On April 27, 2023, NASA's Contracting Officer sent an additional letter to CeleraPro to outline the transition of MSFC from the CASS II contract to the DASS contract. AR at 589. In the letter, NASA explained it anticipated awarding two task orders under DASS for MSFC's administrative support service requirements: one to phase in DASS and phase out CASS II, and the second to fully transition the MSFC services under DASS.[21] AR at 589. As DASS is a sole-source IDIQ contract, NASA explained that "[t]he consolidation of the MSFC requirement into DASS will be accomplished via the addition of a task order to CBF Partners, the IDIQ holder." Def. Mot. Dismiss at 36. NASA's letter also referenced NASA's February 2023 amendment, explaining, "This transition is consistent with NASA Federal Acquisition Regulation (FAR) Supplement (NFS) Appendix A, which designates DASS as an Agency mandatory use contract, and SSC as the designated buying location, for the Space Flight Region, to include MSFC."[22] AR at 589.

## DISCUSSION

Plaintiff's bid protest challenge requires the Court to resolve two principal issues. First, the Court must determine whether Plaintiff has standing to assert its claim. Second, if Plaintiff has standing, this Court must proceed to the merits of Plaintiff's claim itself. Namely, whether NASA's proposed sole source task order under the DASS contract for administrative support services at MSFC is arbitrary, capricious, or violates CICA.

As explained below, the Court denies Defendant's Motion to Dismiss for lack of standing,

---

[21] "MSFC anticipates awarding a 2-month Phase-In task order under the DASS contract on or about May 15, 2023, with an effective start date of June 1, 2023, for the beginning of the Phase-In period. MSFC then anticipates awarding a task order under the DASS contract with an effective start date of August 1, 2023, to fully transition MSFC's administrative support services requirements to the DASS contract which will ensure no lapse in support to MSFC customers." AR at 589.

[22] *See supra* n.13.

denies Plaintiff's Motion for Judgment on the Administrative Record, and grants Defendant's Cross-Motion for Judgment on the Administrative Record.

## I.   __Standing__

Prior to addressing the merits of this case, this Court must address Defendant's Motion to Dismiss for lack of statutory standing.  28 U.S.C. § 1491(b)(1); Def. Mot. Dismiss at 8, 15–20. The United States Court of Appeals for the Federal Circuit (Federal Circuit) recently mandated that a motion to dismiss lodged on the ground that a protestor lacks statutory standing under 28 U.S.C. § 1491(b)(1) must be considered under Rule 12(b)(6) rather than Rule 12(b)(1).[23]  *CACI, Inc.-Fed. v. United States*, 67 F.4th 1145, 1151 (Fed. Cir. 2023); *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1235 (Fed. Cir. 2019) (clarifying that "so-called 'statutory standing' defects do not implicate a court's subject-matter jurisdiction").  Defendant moves to dismiss this matter under Rule 12(b)(1).  Def. Mot. Dismiss at 8, 15–20.  However, in view of *CACI*, both parties agree that the Court may *sua sponte* convert the Defendant's Motion to Dismiss from 12(b)(1) to 12(b)(6).[24]  Oral Arg. Tr. at 8:1–5, 23:4–10; *see Anaheim Gardens v. United States*, 444 F.3d 1309, 1315 (Fed. Cir. 2006) ("The trial court may dismiss *sua sponte* under Rule 12(b)(6)."); *Bitscopic, Inc. v. United States*, 166 Fed. Cl. 677, 696 (2023) (citing *Brown v. United States*, 22 F.4th 1008, 1011–12 (Fed. Cir. 2022); *Vensure Hr, Inc. v. United States*, 164

---

[23] "In *CACI*, the Federal Circuit held that 28 U.S.C. § 1491(b)(1)'s 'interested party' requirement implicates 'statutory standing' and therefore 'is not jurisdictional.'  Accordingly, the Federal Circuit held that its 'prior caselaw treating the interested party issue as a jurisdictional issue . . . is no longer good law in this respect.'"  *Bitscopic*, 166 Fed. Cl. at 693 (quoting *CACI*, 67 F.4th at 1151).

[24] At Oral Argument, both parties agreed that the Court may *sua sponte* convert the Defendant's Motion to Dismiss from a 12(b)(1) to 12(b)(6).  Oral Arg. Tr. at 8:1–5 (The Court: "And you think I can convert it *sua sponte*?  Defendant: You can, yes, absolutely.  You're always allowed to do that.  *CACI* or no *CACI*, you can always do that."); *Id*. at 23:4–10 (The Court: "[Y]ou'd agree that . . . because of this new Federal Circuit decision, [] I can convert this to a 12(b)(6) rather than a 12(b)(1)?"  Plaintiff: "I would agree with that position, yes, Your Honor.") (emphasis added).

Fed. Cl. 276, 284 (2023); *Roberson v. United States*, 115 Fed. Cl. 234, 241 (2014) ("This Court may . . . convert a motion to dismiss under Rule 12(b)(1) to a motion to dismiss under Rule 12(b)(6), particularly where, as here, the parties have an opportunity to be heard regarding the alternative ground for dismissal.")).   Accordingly, and on consent of the parties, this Court analyzes Defendant's Motion to Dismiss under Rule 12(b)(6).[25]

When considering a motion to dismiss under Rule 12(b)(6), the Court must "take as true all undisputed facts alleged in the complaint and draw all reasonable inferences based on those allegations."[26] *Vasko v. United States*, 581 F. App'x 894, 897 (Fed. Cir. 2014) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)).   To withstand dismissal under Rule 12(b)(6), a complaint "must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849, 853 (Fed. Cir. 2009) (quoting *Twombly*, 550 U.S. at 557).   Put differently, the plaintiff's "[f]actual allegations must be enough to raise a right of relief above the speculative level." *Twombly*, 550 U.S. at 545 (requiring "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of [the plaintiff's claim]").   Dismissal for failure to state a claim upon which relief can be granted under Rule 12(b)(6) "is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002); *Welty v. United States*, 926 F.3d 1319, 1323 (Fed. Cir. 2019).

---

[25] In the present action, the Court's ruling to deny Defendant's Motion to Dismiss would be the same regardless of whether the standing analysis is considered under Rule 12(b)(6) or 12(b)(1).

[26] The Defendant has accepted all the Plaintiff's factual allegations as true.   Oral Arg. Tr. at 7:17–25 (Defendant: "[W]e think the analysis is very easily resolved as being a 12(b)(6) analysis as opposed to a 12(b)(1), because we are accepting all factual allegations in the complaint, especially paragraph 20, which references the set-aside as true. So we don't think that it changes the nature of the [Motion to Dismiss].").

This Court may consider evidence outside the four corners of the complaint to determine whether a plausible claim for relief exists. *Dimare Fresh, Inc. v. United States*, 808 F.3d 1301, 1306 (Fed. Cir. 2015) (quoting 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRAC. AND PROC. § 1357 (3d ed. 2004)) ("Although we primarily consider the allegations in a complaint, we are 'not limited to the four corners of the complaint.' . . . . We may also look to 'matters incorporated by reference or integral to the claim, items subject to judicial notice, [and] matters of public record.'"). Thus, on a motion to dismiss for failure to state a claim under Rule 12(b)(6), this Court considers "documents incorporated into the complaint by reference." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *Rocky Mountain Helium, LLC v. United States*, 841 F.3d 1320, 1325 (Fed. Cir. 2016) (quoting *Tellabs*, 551 U.S. at 322).

Under the Tucker Act, this Court has jurisdiction over actions "by an interested party objecting to a . . . proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1); Compl. ¶ 4. A bid protestor before this Court must establish both statutory and Article III standing.[27] *See CACI*, 67 F.4th at 1151; *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed. Cir. 1988); *Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 125–28 (2014) (discussing both Article III jurisdiction and the separate question of statutory standing, i.e., "the meaning of [a] congressionally enacted provision creating a cause of action").

The parties dispute statutory standing. For a protester to establish statutory standing, it must demonstrate that it is an "interested party."[28] 28 U.S.C. § 1491(b)(1). The Federal Circuit

---

[27] This Court's statutory standing is more stringent than Article III standing. *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (citing *Am. Fed'n of Gov. Emps. v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) ("[Section] 28 U.S.C. § 1491(b)(1) . . . imposes more stringent standing requirements than Article III.").

[28] The Federal Circuit has interpreted "the term 'interested party' as synonymous with 'interested

has interpreted the term "interested party" under 28 U.S.C. § 1491(b)(1) to encompass a two-part test. A protestor is required to establish that it (1) is an actual or prospective bidder who possesses (2) a requisite direct economic interest.[29] *CACI*, 67 F.4th at 1151; *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006); *Weeks Marine*, 575 F.3d at 1359.

A protestor must also establish prejudice. *Mgmt. Sols. & Sys.*, 75 Fed. Cl. at 825 (quoting *Galen Med. Assocs. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004)) ("[T]o prevail in a protest the protester must show not only a significant error in the procurement process, but also that the error prejudiced it.") (internal citations omitted)); *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996). For a prospective bidder to demonstrate prejudice, the Federal Circuit directs that the protester is required to "show that it had a 'substantial chance' of winning the contract." *CACI*, 67 F.4th at 1151 (citing *Digitalis Educ. Sols., Inc. v. United States*, 664 F.3d 1380, 1384 (Fed. Cir. 2012)); *Rex Serv. Corp.*, 488 F.3d at 1308; *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996) (alteration in original) (emphasis in original) (internal quotations omitted) (quoting *CACI., Inc.-Fed. v. United States*, 719 F.2d 1567, 1574–75 (Fed. Cir. 1983)) ("To establish competitive prejudice, a protester must demonstrate that but for the alleged error, there was a *substantial chance* that [it] would receive an award—that it was within the zone of active consideration."). As explained by the Federal Circuit, "[i]n other words, the protestor's chance of securing the award must not have been insubstantial." *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (citing *Am. Fed'n,* 258 F.3d at 1302; *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1334 (Fed. Cir.

---

party,' as defined by the Competition in Contracting Act, 31 U.S.C. § 351." *Mgmt. Sols. & Sys.*, 75 Fed. Cl. 820, 824–25 (2007).

[29] Plaintiff asserts it is an interested party. Compl. ¶ 5.

2001)).

Courts have previously considered prejudice in the context of CICA.  *See Ian, Evan & Alexander Corp. v. United* States, 136 Fed. Cl. 390 (2018); *Savantage Fin. Servs., Inc. v. United States*, 81 Fed. Cl. 300 (2008).  Indeed, "the question of prejudice turns, in part, on the relationship between the protester(s) and the specific procurement process that is being challenged."  *Mgmt. Sols. & Sys.*, 75 Fed. Cl. at 825.  As the Federal Circuit has explained:

> [T]he Federal Circuit has held that the issue of prejudice may be dependent upon the type of relief sought by the parties . . . . "[W]here the plaintiff claims that the government was obligated to rebid the contract (as contrasted with a situation in which the plaintiff claims that it should have received the award in the original bid process).  [] To have standing, the plaintiff need only establish that it 'could compete for the contract' if the bid process were made competitive.... [Plaintiff] *need not* show that it would have received the award in competition with other hypothetical bidders, [but rather] must show that it would have been a qualified bidder."

*Id.* (quoting *Myers Investigative & Sec. Servs.*, *Inc. v. United States*, 275 F.3d 1366, 1370 (Fed. Cir. 2002), *abrogated on other grounds by CACI*, 67 F.4th at 1145[30] (citing *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1334) (alterations in original) ("[I]f appellant's bid protest were allowed because of an arbitrary and capricious responsibility determination by the contracting officer, the government would be obligated to rebid the contract, and appellant could compete for the contract once again.  Under these circumstances, the appellant has a 'substantial chance' of receiving the award and an economic interest and has standing to challenge the award.")); *Savantage Fin. Servs., Inc.*, 81 Fed. Cl. at 306 (quoting *Myers*, 275 F.3d at 1370–71).

---

[30] The Federal Circuit's recent decision in *CACI* overruled *Myers Investigative & Sec. Servs.* only as far as its findings implicated prejudice as jurisdictional.  *CACI*, 67 F.4th at 1153.

A.    **CeleraPro is a Prospective Bidder**

At the outset, CeleraPro is not an actual bidder for the administrative support services at issue because NASA did not issue a competitive Solicitation, but instead plans to modify the DASS contract to encompass administrative support services for MSFC.  Compl. ¶¶ 18–21; *Rex Serv. Corp.*, 448 F.3d at 1307 (explaining that an actual bidder is one who bids on the protested Solicitation).  Thus, for standing purposes, the Court must consider whether Plaintiff qualifies as a prospective bidder.

Defendant contends CeleraPro is not a prospective bidder.  Def. Mot. Dismiss at 15.  The majority of Defendant's standing argument, however, is merely a string of inferences.[31]  At the center of Defendant's argument is a contention that even if CeleraPro were to get the relief it seeks, CeleraPro would still be unable to bid on a new Solicitation and therefore cannot be a prospective bidder.  *Id.* at 20.  Specifically, Defendant argues that "[a]ll of the administrative requirements for the Space Flight Regions are set-aside for 8(a) businesses" and "MSFC is required to purchase its administrative support services from SSC under DASS."  *Id.* at 19; Compl. ¶ 19.  Additionally, in its briefing, Defendant argues that Plaintiff lacks standing "because the [MSFC] requirement is now an 8(a) set-aside and CeleraPro is not a qualified 8(a) business and is ineligible to compete for the follow-on procurement."  Def. Mot. Dismiss at 14.

Fundamental to Defendant's contentions is a presumption that NASA appropriately

---

[31] The core of Defendant's standing argument is as follows: DASS was solicited as a 100% 8(a) set-aside to include SSC and JSC.  When NASA added KSC to DASS, its administrative support services became an 8(a) set-aside.  When NASA decided to consolidate MSFC under DASS, it received permission from the SBA to add MSFC's administrative support requirements as an 8(a) under DASS.  Once a procurement is accepted into the 8(a) program, all follow-on requirements for that follow-on remain in the 8(a) program.  Accordingly, Defendant contends all of MSFC's follow-on administrative support requirements are and will remain 8(a) set-asides under the DASS contract.  Def. Mot. Dismiss at 15–20.

awarded administrative services for MSFC as a task order under the sole-source DASS contract, rather than as a competitive solicitation.  *See Savantage Fin. Servs.*, 81 Fed. Cl. at 306 (noting a defendant contesting plaintiff's standing by arguing plaintiff would be unqualified to compete in a competitive solicitation "misses the point" because the protest was based on an agency's underlying decision not to subject the services at issue to competitive procurement).  As Plaintiff aptly observed during Oral Argument, "some of the confusion here [regarding Defendant's standing argument] is because there are holes in the logic and the position that the Government is taking."[32]  Oral Arg. Tr. at 15:3–5.  This Court agrees with Plaintiff, which points out that the Defendant's argument "misses the mark for multiple reasons."  Pl. Response at 4.

In addressing Defendant's Motion to Dismiss, this Court is "obligated to assume all factual allegations as true" and may consider the plausibility of Plaintiff's claim.  *Henke v. United States*, 60 F.3d 795, 797 (Fed. Cir. 1995); *Meidinger v. United States*, 989 F.3d 1353, 1357 (Fed. Cir. 2021); *Dimare Fresh,* 808 F.3d at 1306 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  It is true that NASA amended its own internal guidelines to make SSC the mandatory buying location

---

[32] At Oral Argument, the Court questioned the parties about Defendant's standing theory.  *See, e.g.*, Oral Arg. Tr. at 8:17–9:9 (The Court: "Let's say this – I'll call it a task order –[that] was not issued through DASS . . . and the work was procured under a separate contract vehicle . . . . Would [a] solicitation for Marshall's administrative support . . . still be a set-aside as an . . . 8(a) company?"  The Defendant: "I believe so."  Well, again, Your Honor -- and I'll go back to something [Defendant's counsel] said when you asked her about would it -- would the follow-on be an 8(a) contract -- contract. And her response to the Court was 'I believe so.' You know, a 'believe so' does not create a lack of standing, because the Government does not have any actual knowledge, and there's nothing in the record to reflect that any follow-on opportunity is going to be an 8(a). It very well might be, but without the -- without the supporting market research for the whole consolidated contract, I think the Government's position is premature.").

for the Space Flight Region, which includes MSFC.[33]  AR at 9302.  It is also true that NASA

amended its guidance to designate DASS as the mandatory use contract for administrative support

services for the Space Flight Region.  AR at 9302.  But the presumption that it is proper for the

SSC to purchase administrative support services for the MSFC under the DASS contract in the

first place remains fundamental to the Defendant's argument regardless.  It is not at all certain that

"[a]ll of the administrative requirements for the Space Flight Regions are set-aside for 8(a)

businesses."  Def. Mot. Dismiss at 19.  It is far from definitive at the Rule 12(b)(6) stage whether

"MSFC is required to purchase its administrative support services from SSC under DASS."  *Id*;

*Savantage Fin. Servs.*, 81 Fed. Cl. at 306 (quoting *CCL, Inc. v. United States*, 39 Fed. Cl. 780, 790

(1997)) ("Where a claim is made that the government violated CICA by refusing to engage in a

competitive procurement . . . 'it is sufficient for standing purposes if the plaintiff shows that it

likely would have competed for the contract had the government publicly invited bids or requested

proposals.'").  Indeed, the dispute in this case concerns whether MSFC's administrative support

services should fall under the DASS contract or must be awarded via a separate, competitive

procurement — not whether Plaintiff is eligible to receive work under the DASS contract.  At the

12(b)(6) stage, there is simply no indication that such a separate, competitive procurement must

be an 8(a) set aside.

Similarly, the SBA's decision to add MSFC as an 8(a) *under DASS* does not impact

Plaintiff's standing to challenge NASA's lack of a separate competitive bid process to procure the

administrative support services at issue in accordance with CICA.  Defendant's Reply in Support

of its Motion to Dismiss, or, in the Alternative, Motion for Judgment on the Administrative Record

(ECF No. 27) (Def. Reply) at 3 (citing AR at 911) ("In May 2023, NASA coordinated with the

---

[33] *See supra* n.13 (explaining the February 2023 revision to NASA's NFS Appendix A was not codified in the Code of Federal Regulations (CFR) or subject to public comment).

SBA, the agency with whom it has contracted for the DASS contract, to add the MSFC work to the DASS contract.").

Defendant contends that in adding MSFC as an 8(a) under DASS, "NASA and the SBA agreed that all future DASS-like work would be set-aside in the 8(a) program, making CeleraPro ineligible for the new contract based on its lack of 8(a) status . . . [because] [o]nce a requirement has been accepted by the SBA into the 8(a) program, any follow-on requirements shall remain in the program, absent limited exceptions such as an agreement by the SBA to release the requirement from the program or a mandatory source."  Def. Reply at 3.  However, as noted, this misses the point, and even so, there are several flaws in Defendant's argument.  As Plaintiff notes, in accordance with FAR requirements, no additional market research has been conducted beyond that which occurred for SSC and JSC's consolidation under DASS.  Oral Arg. Tr. at 15:18–21, 18:14–17 ("There is nothing in the record that shows NASA's conducted market research to say a consolidate four space flight center opportunity would be an 8(a) set-aside.").  And as acknowledged by Defendant, there are several exceptions to its follow-on argument.[34]  Def. Mot. Dismiss at 18 (citing 13 C.F.R. § 124.504(d)).  Indeed, the FAR's definition of a follow-on requirement itself includes many considerations to even deem work a follow-on.[35]  13 C.F.R. §

---

[34] "Once a requirement has been accepted by SBA into the 8(a) program, any follow-on requirements shall remain in the 8(a) program unless there is a mandatory source. . . or SBA agrees to release the requirement from the 8(a) program in accordance with 13 CFR 124.504(d)."  48 C.F.R. § 19.815(a).

[35] The CFR includes the following definition for a follow-on requirement or contract, which explains whether a new contract is a follow-on is based on a number of considerations:

> The determination of whether a particular requirement or contract is a follow-on includes consideration of whether the scope has changed significantly, requiring meaningful different types of work or different capabilities; whether the magnitude or value of the requirement has changed by at least 25 percent for equivalent periods of performance; and whether the end user of the requirement has changed. As a general guide, if the procurement satisfies at least one of these

124.3.  Put simply, it is not clear at this stage in the litigation whether MSFC's administrative

support services would even qualify as an 8(a) follow-on requirement under the FAR.  When ruling

on 12(b)(6), the Court is required to assume Plaintiff's factual allegations in its Complaint as true

and "draw[s] all reasonable inferences based on those allegations."  *Vasko,* 581 F. App'x at 897

(citing *Twombly*, 550 U.S. at 555–56).  Furthermore, the Defendant does not contest the factual

allegations of Plaintiff's Complaint.  *See supra* n.26 (citing Oral Arg. Tr. at 7:17–25).

Accordingly, based on its well-pleaded allegations, Plaintiff would clearly be a prospective bidder

here if, as Plaintiff contends, NASA were required to award the contract through a competitive bid

process.

### B.  CeleraPro has Demonstrated a Requisite Direct Economic Interest

To determine if CeleraPro is an "interested party" in accordance with this Court's statutory

standing under 28 U.S.C. § 1491(b)(1), the Court must next consider whether CeleraPro possesses

a requisite direct economic interest.  Defendant argues that "CeleraPro is not qualified as an 8(a)

business; it therefore has no economic interest in any follow-on requirement."  Def. Mot. Dismiss

at 20.  As explained above, Defendant has not demonstrated that CeleraPro must be an 8(a)

business to compete for MSFC's administrative support services.

In its Complaint, Plaintiff alleges that "CeleraPro has a direct economic interest that is

being affected by NASA's procurement decisions."  Compl. ¶ 5.  CeleraPro further alleges that it

is the incumbent contractor providing administrative support services at MSFC under the CASS II

---

three conditions, it may be considered a new requirement. However, meeting any
one of these conditions is not dispositive that a requirement is new. In particular,
the 25 percent rule cannot be applied rigidly in all cases. Conversely, if the
requirement satisfies none of these conditions, it is considered a follow-on
procurement.

13 C.F.R. § 124.3.

contract.  Compl. ¶ 13.  NASA solicited the CASS II contract as a 100% SBA certified HUBZone set-aside —and not as an 8(a) —21 days *after* DASS was awarded to CBF Partners JV.  AR at 1, 919, 8191; Pl. MJAR at 7.  The CASS II contract included the potential for five years of performance.  Compl. ¶ 12; AR at 919–21. The consolidation of MSFC under DASS, an 8(a) set-aside, takes CeleraPro as the incumbent contractor out of the equation.[36]

CeleraPro must also establish prejudice by showing it has a "substantial chance" of receiving the award, meaning the protestor's chance of securing the award must not have been insubstantial.  *Rex Service Corp.*, 488 F.3d at 1308; *Info. Tech. & Applications Corp.*, 316 F.3d at 1319 (citing *Am. Fed'n*, 258 F.3d at 1302; *Impresa Construzioni Geom. Domenico Garufi,* 238 F.3d at 1334).  As the Defendant itself points out, "[u]ltimately, CeleraPro's ability to establish Article III standing and to meet the requirements of 28 U.S.C § 1491(b)(1) both turn on whether it was prejudiced by the errors it alleges."  Def. Mot. Dismiss at 17.

The showing of "substantial chance" required to prove prejudice is dependent upon the relief sought.  *Myers*, 275 F.3d at 1370 (citing *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1334).  The Federal Circuit's reasoning in *Myers* and *Impresa Construzioni Geom. Domenico Garufi* supports this Court's conclusion that Plaintiff would have a substantial chance of receiving the award.  Indeed, the Federal Circuit has noted that, like the present case, a plaintiff claiming the Government is "obligated to rebid the contract . . . need only establish that it 'could compete for the contract' if the bid process were made competitive."  *Myers*, 275 F.3d at 1370 (quoting *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1334).  Said differently, the plaintiff must establish it would be a "qualified bidder."  *Myers*, 275 F.3d at 1371.  To that end,

---

[36] As noted, Plaintiff does not contest NASA's decision not to exercise the additional option years under the CASS II contract.  Pl. MJAR at 6; Oral Arg. Tr. at 20:11–15.

"an alleged error in the procurement process would prejudice [plaintiff]" because if a competitive bid had occurred, "[plaintiff] would have been qualified to compete for the procurement, because it had performed these services in the past." *Mgmt. Sols. & Sys.*, 75 Fed. Cl. at 826 (considering "a modification to a previously existing contract [that] was not the result of a competitive bid process.").

Here, like in *Impresa Construzioni Geom. Domenico Garufi*, the Plaintiff claims NASA is obligated to rebid the contract because the proposed modification to add MSFC to the DASS contract did not involve a competitive bid process. Compl. ¶¶ 21, 23–24, 26–27. Like the plaintiff in *Management Solutions & Systems*, Plaintiff performed these services in the past and, in fact, is the current incumbent contractor for the MSFC location. Compl. ¶¶ 5, 14. CeleraPro's current contract for administrative support services at MSFC was solicited *after* the award of DASS and specifically called for the type of business CeleraPro is, a 100% HUBZone business. Compl. ¶ 11; AR at 1, 919. Further, if in evaluating Plaintiff's claim on the merits this Court were to find NASA's actions to be arbitrary and capricious, "the government would be obligated to rebid the contract, and appellant could compete for the contract . . . ." *Impresa Construzioni Geom. Domenico Garufi*, 238 F.3d at 1334 (citing *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed.Cir.1999)). According to its Complaint, Plaintiff would bid on this contract. Compl. ¶ 5. Thus, it is well-established, that, "[u]nder these circumstances, [the plaintiff] has a 'substantial chance' of receiving the award." Pl. MJAR at 5 (quoting *Assessment and Training Sols. Consulting Corp. v. United States*, 92 Fed. Cl. 722, 728 (2010)). Accordingly, as Plaintiff satisfies the "interested party" requirement, it is evident that Plaintiff has standing under 28 U.S.C. § 1491(b)(1) to pursue its claim on the merits.

## II.   CeleraPro's CICA Claim

Having confirmed Plaintiff has met this Court's statutory standing requirements, the Court next addresses the merits of Plaintiff's claim.   CeleraPro's Complaint alleges that NASA's decision to modify the DASS contract to include MSFC triggers the competition requirements of CICA and is arbitrary, capricious, and contrary to law.   Accordingly, the Court must determine whether the proposed modification materially departs from the scope of the original procurement (the DASS contract).

In a bid protest, the Court "reviews the agency's procurement decision to determine whether it is supported by the administrative record." *Ian, Evan & Alexander Corp.*, 136 Fed. Cl. at 408 (citing *CW Gov't Travel, Inc. v. United States*, 110 Fed. Cl. 462, 481 (2013)).   Under the Tucker Act, protests of agency procurement decisions are reviewed under Administrative Procedure Act (APA) standards.   *See* 28 U.S.C. § 1491(b)(4) (adopting the standard of review outlined in 5 U.S.C. § 706); *see also Weeks Marine*, 575 F.3d at 1358 (citing *Bannum v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005)).   Accordingly, the Court may only set aside an agency decision it finds "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."   5 U.S.C. § 706; *Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1309 (Fed. Cir. 2016) (quoting *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)) (explaining protests are properly reviewed under APA standards and shall only be set aside under 5 U.S.C. § 706).

This Court's review of bid protests is highly deferential to agency action.   *Weeks Marine,* 575 F.3d at 1369 ("Under ['highly deferential' rational basis review], we sustain an agency action 'evincing rational reasoning and consideration of relevant factors'" (quoting *Advanced Data Concepts, Inc. v. United States,* 216 F.3d 1054, 1058 (Fed. Cir. 2000))).   Ultimately, if the Court finds an agency action is within its bounds, it is not for the Court to substitute its own judgment

for that of the agency. *Id.* at 1371 ("If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations" (quoting *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989))); *Co-Steel Raritan, Inc. v. Int'l Trade Comm'n*, 357 F.3d 1294, 1309 (Fed. Cir. 2004) ("[T]he ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency."). Plaintiff must demonstrate arbitrary and capricious conduct by a preponderance of the evidence. *Ian, Evan & Alexander Corp.*, 136 Fed. Cl. at 412 (citing *Tinton Falls Lodging Realty, LLC v. United States*, 800 F.3d 1353, 1364 (Fed. Cir. 2015)); *see also Grumman Data Sys. Corp. v. Dalton*, 88 F.3d 990, 995–96 (Fed. Cir. 1996).

As noted, CeleraPro contends NASA's proposed modification violates CICA's requirement for agencies to "obtain full and open competition through the use of competitive procedures." 41 U.S.C. § 3301(a)(1). As the Federal Circuit has long held, "CICA, however, does not prevent modification of a contract by requiring a new bid procedure for every change. Rather only modifications outside the scope of the original competed contract fall under the statutory competition requirement." *AT&T Commc'ns, Inc. v. Wiltel, Inc.*, 1 F.3d 1201, 1205 (Fed. Cir. 1993). Whether NASA violates CICA's competitive procedures in modifying the DASS contract turns on whether such modification materially changes the scope of DASS as the original contract. *Cardinal Maint. Serv., Inc. v. United States*, 63 Fed. Cl. 98, 106 (2004).

However, "CICA sets forth no standard for determining when modification of an existing contract requires a new competition or falls within the scope of the original competitive procurement." *AT&T Commc'ns*, 1 F.3d at 1204–05; *see also Cardinal Maint. Serv.*, 63 Fed. Cl. at 106. As a result, the Federal Circuit has historically employed the cardinal change doctrine to

test whether a contract modification may trigger CICA's competition requirements. *AT&T Commc'ns*, 1 F.3d at 1205 ("The cardinal change doctrine asks whether a modification exceeds the scope of the contract's changes clause; this case asks whether the modification is within the scope of the competition conducted to achieve the original contract. In application, these questions overlap."); *Timberline Helicopters, Inc. v. United States*, 140 Fed. Cl. 614, 623 (2018) ("In [AT&T], the court of appeals held that if the government effects a modification of a contract that constitutes a 'cardinal change,' it may trigger [CICA]."); *see also Ian, Evan & Alexander Corp.*, 136 Fed. Cl. at 415; *Mgmt. Sols & Sys.*, 75 Fed. Cl. at 830; *Cardinal Maint. Serv.*, 63 Fed. Cl. at 106. The cardinal change doctrine prevents the government from requiring contractors to "undertake tasks that were not within the scope of the original contract." *Cardinal Maint. Serv.*, 63 Fed. Cl. at 106. To that end, in the context of CICA, the Federal Circuit has applied the cardinal change doctrine to hold "the government cannot modify a contract to such an extent that the contract, as modified, is materially different from the contract that was originally competed." *Id.* (citing *Exec. Bus. Media, Inc. v. United States Dep't. of Defense*, 3 F.3d 759, 764 (4th Cir. 1993)); *see generally AT&T Commc'ns*, 1 F.3d at 1205.

To determine "whether the contract as modified materially departs from the scope of the original procurement," the Court considers: "(1) whether the modification is of a nature which potential offerors would reasonably have anticipated; and (2) whether the modification substantially changes the type of work, performance period, and costs as between the original contract and the modified contract." [37] *AT&T Commc'ns*, 1 F.3d at 1205; *Portfolio Disposition Mgmt. Grp. LLC v. United States*, 64 Fed. Cl. 1, 12 (2005) (citing *Cardinal Maint. Serv.,* 63 Fed.

---

[37] The parties do not dispute the test set forth by the Court under CICA. *See infra* n.44.

Cl. at 106 (citations omitted)); *Timberline Helicopters*, 140 Fed. Cl. at 623 (quoting the two considerations); *Ian, Evan & Alexander Corp.*, 136 Fed. Cl. at 416 (same).

A.    **NASA's DASS Contract Reasonably Informs Offerors of the Potential for New Locations**

As the Federal Circuit explained in *AT&T Communications, Inc. v. Witel*, "[a]n important factor in determining the scope of the original competition is 'whether the solicitation for the original contract adequately advised offerors of the potential for the type of changes during the course of the contract that in fact occurred, or whether the modification is of a nature which potential offerors would reasonably have anticipated.'" 1 F.3d at 1207 (quoting *Neil R. Gross & Co.,* 90–1 CPD ¶ 212 at 3 (1990) (citation omitted)).  Put differently, "[a] modification generally falls within the scope of the original procurement if potential bidders would have expected it to fall within the contract's changes clause."  *Id.* at 1205.  "Whether potential bidders would have anticipated a particular modification is judged under an objective standard, . . . and 'depends heavily on the language of the solicitation.'"  *Ian, Evan & Alexander Corp.*, 136 Fed. Cl. at 417 (citing *Global Comput. Enters., Inc. v. United States*, 88 Fed. Cl. 52, 56 (2009); *CESC Plaza Ltd. P'ship v. United States*, 52 Fed. Cl. 91, 93 (2002); *CCL*, 39 Fed. Cl. at 791) (quoting *Northrop Grumman Corp. v. United States*, 50 Fed. Cl. 443, 466 (2001) (citing JOHN CIBINIC, JR. & RALPH C. NASH, JR., ADMINISTRATION OF GOVERNMENT CONTRACTS 389 (3d ed. 1995))).  Thus, the Court must determine whether the DASS contract reasonably informed offerors of the potential for inclusion of NASA locations aside from JSC and SSC, or whether the modification to include MSFC under DASS is of a nature which potential offerors would reasonably have anticipated. *AT&T Commc'ns*, 1 F.3d at 1207 (citing *Neil R. Gross & Co.,* 90–1 CPD ¶ 212 at 3 (1990) (citation omitted)).

### a. The DASS Solicitation

The parties largely focus on whether the DASS Solicitation reasonably informed offerors of the potential for inclusion of additional NASA locations aside from JSC and SSC. CeleraPro argues the answer is no, contending "NASA hinges all of [its] non-competitive additions [to the DASS contract] on one sentence in the original DASS."[38] Pl. MJAR at 5. The sentence in question references the phrase "*other NASA operating locations*" in Section 1.0 of the original DASS contract's SOW.[39] AR at 876 (emphasis added).

Defendant disputes Plaintiff's account that NASA relies on a single sentence to demonstrate notice. Defendant responds that (1) the DASS Solicitation conveyed "multiple times" that offerors may be required to perform services at multiple space centers, and (2) other offerors understood this possibility to cover locations outside of the JSC and SSC. Def. Mot. Dismiss at 25.

### b. The DASS Solicitation Language

In support of its first point, Defendant relies on the same provisions of the DASS Solicitation as NASA relied on in the MSFC Scope Determination, pointing to Section 1.3 of the RFP and Section 1.0 of the DASS SOW. *Id.* at 26. Defendant also cites several additional portions

---

[38] Plaintiff is plainly incorrect to state that NASA justified its decision to expand DASS to MSFC via only Section 1.0 of the SOW. As explained above, the administrative record includes two NASA Memoranda for the Record that make a scope determination of the DASS contract and analyze whether a proposed modification triggered CICA's competition requirements. The first Memorandum was created for the KSC consolidation under the DASS contract, and the second for the proposed MSFC consolidation at issue in this case. Although the KSC Memorandum relies only on one sentence of Section 1.0 of the SOW, the second Memorandum regarding the proposed MSFC locations cites Section 1.0 of the SOW and Section 1.3 of the RFP. AR at 887–89, 890–92.

[39] Pl. MJAR at 5 ("The general statement that there 'may be work at other locations' is not sufficient to alert all potential DASS offerors that that contract would more than double in size and add three additional locations.").

of the Solicitation.[40]

The Request for Proposal (RFP), Section 1.3, the Place of Performance – Services, states the following:

> The Contractor shall perform the work under this contract at the Government's site, defined as the Stennis Space Center (SSC), Johnson Space Center (JSC) (including Government maintained facilities in the immediate JSC area (including the Sonny Carter Training Facility and Ellington Field)), the White Sands Test Facility located in Las Cruces, New Mexico. The Contractor may be required to perform services at other NASA operating locations or alternate work locations not currently specified. In the event services are required at other NASA operating locations or alternate work locations the Government and the Contractor shall negotiate the Fully Burdened Rates (FBR) for the location.

AR at 8195.

Section 1.0 of the DASS SOW contains similar language and is also cited by both parties:

> The Statement of Work (SOW) describes the products and services to be provided by the Contractor to NASA at the Government's sites, defined as the Johnson Space Center (JSC), and Government-maintained facilities in the immediate JSC area (including the Sonny Carter Training Facility and Ellington Field), the White Sands Test Facility (WSTF) located in Las Cruces, New Mexico, and the Stennis Space Center (SSC), MS. In the event services are required at other NASA operating locations or alternate work locations the Government and the Contractor shall negotiate the fully burdened rate (FBR) for the location.

AR at 876.

Defendant argues the language at issue in the DASS Solicitation, "other NASA operating locations or alternate work locations," is meant to encompass locations, including Space Centers, other than JSC and SSC. Def. Mot. Dismiss at 25; *see also id.* at 23–28; Oral Arg. Tr. at 49:13–

---

[40] Defendant cites the following short provisions in the DASS Solicitation: Section 5.15.3.1(b) (AR at 8230) (Management Plan, as discussed below); Section 5.15.3.2(a)(2) (AR at 8231) (defining the relevant experience to include multiple geographic locations); Section 5.15.2(a) (AR at 8228) and its reference to Attachment 5 of the Solicitation (AR at 8261) (requiring a past performance matrix of "multiple geographic locations.").

19.  At Oral Argument, the Court questioned, "Why not use the word 'center' in this clause, then, instead of 'other operating locations' or 'alternate work locations?'"  Oral Arg. Tr. at 50:16–18. Defendant responded that those terms are broader, namely that all NASA employees working for space centers may not work on-site at a particular Space Center, and such terms would include staff at off-site contractor or training locations.  Oral Arg. Tr. at 50:21–51:3.  Defendant further contends that although other Space Centers were not mentioned by name, the DASS Solicitation anticipated and provided for their prospective addition.  *See* Def. Mot. Dismiss at 34.  Defendant points to language in Section 1.3 in support of its argument: "In the event services are required at other NASA operating locations or alternate work locations, the Government and the contractor shall negotiate the Fully Burdened Rates (FBR) for the location."  *Id*; AR at 8195.  As a result, according to Defendant, "there was no need to specifically [specify] . . . the Kennedy Space Center or the Marshall Space Center, for example, because that would have been handled at the time in which they were added."[41]  Oral Arg. Tr. at 52:12–16.

       **c.**       **Offeror Proposals**

In support of its second point, Defendant also argues that other offerors understood the language of the DASS contract to include other space centers because several offerors' proposals highlighted those offerors' ability to service multiple space centers.  Def. Mot. Dismiss at 28.  For example, Defendant points to paragraph 2.0 of offeror ███████ management plan, providing:

███████████████████████████████████████
███████████████████████████████████████

---

[41] Plaintiff also argues that the CASS II Solicitation was published only 21 days after the DASS contract was awarded, which it believes supports the argument that "[a]t the time, NASA treated DASS and CASS II as different contractual opportunities."  Pl. MJAR at 7.  When questioned about this timing at Oral Argument, Defendant explained the decision was based on "what the needs were based on when contracts were expiring and doing a phased approach."  Oral Arg. Tr. at 56:11–12.  Such a decision concerning the timing and efficiencies to such a phased approach falls squarely with the agency's discretion; this Court declines to second-guess such a decision.



AR at 8337 (emphasis added).  Defendant cites several other references in offeror management plans for support of its reading of the DASS Solicitation.[42]  Moreover, paragraph B.1 of ████ Administrative Performance Plan specifically states:



AR at 8512 (emphasis added).

However, much of the parties' arguments regarding offeror proposals center around the

---

[42] Def. Mot. Dismiss at 31 ("In fact, when one reads the references to multiple geographic locations in offerors' management plans, it is clear that they understood NASA's future needs might necessitate services at multiple space centers."). Defendant cites several offeror proposals for support:



*Id.* (internal citations omitted).

instructions of the Management Plan in the DASS Solicitation, which reads in part: "Offerors shall provide a management plan that identifies their approach to managing multiple, geographically disbursed locations."  AR at 8230.  CeleraPro emphasizes that just a few paragraphs later, the Solicitation calls for a related-staffing plan and states, "The staffing plan shall address the following for *each* performance location covered by the DASS contract."  AR at 8230 (emphasis added).  According to Plaintiff, this portion of the Management Plan demonstrates that the DASS contract was meant to cover specific locations.  Pl. Response at 6–7.  Plaintiff notes, "not one single offeror mentions performing work [at] Kennedy or Marshall Space Centers."  *Id.* at 7 (emphasis omitted).  Moreover, Plaintiff argues the instructive language "multiple geographically disbursed locations" is meant to address JSC and SSC, which are "located hundreds of miles apart."  *Id.* at 6.

In its briefs and at Oral Argument, Defendant argued that no other Space Centers are explicitly mentioned because NASA planned to make these determinations later and therefore included the language "other NASA operating locations or alternate work locations" to provide it with a future option to expand work locations.  Oral Arg. Tr. at 52:9–10; Def. Reply at 7 ("CeleraPro's assertion that offerors did not know they would need to service either KSC or MFSC [sic] because they did not expressly mention them by name in their proposals is utterly unconvincing and renders the solicitation provisions meaningless.").  At Oral Argument, the Court questioned Defendant on this portion of the Management Plan.  Defendant explained "[Offerors] could have identified other space centers if they so choose, but it wasn't necessary to do that because the place of performance specifically indicated that . . . in the event services are required at other NASA operating locations or alternate work locations, the Government and the contractor shall negotiate the fully burdened rates for the location . . . after they were identified."  Oral Arg.

Tr. at 71:5–11.

        **d.**      **The Master Buy Plan**

Plaintiff argues that NASA's internal documents at the time of the consolidation decision of JSC and SSC are "reflective of what NASA's intent was," meaning NASA only ever intended for DASS to include the two Space Flight Centers explicitly mentioned.[43]  Oral Arg. Tr. at 33:5.

Plaintiff relies on the Master Buy Plan, which Plaintiff acknowledged at Oral Argument is the *only* document that "specifically ties" the Solicitation language at issue to its argument that DASS was only ever meant to apply to JSC and SSC:

> The Court: Well, let's go through the record . . . [B]esides the [Master Buy Plan], . . . where in the record shows some sort of restriction tying . . . – "other NASA operating locations or alternative work locations not currently specified" back to Johnson and Stennis?

> Plaintiff: Other than the document in the master buy plan, Your Honor, I would say there is no -- there is nothing else that specifically ties it back to those locations, but, again, . . . I think if we look at the proposals that were all received on DASS, every single one of them, and you read through all of them . . . not one mention of working at Marshall or working at Kennedy or working at anything other than the Stennis and Johnson areas.

Oral Arg. Tr. at 34:14–35:6.  The Master Buy Plan states in part:

> The Johnson Space Center (JSC) and Stennis Space Center (SSC) both require administrative support to organizations in fulfilling the command's mission. Services will be required at the following locations: SSC, JSC on-site, Ellington Field, Sonny Carter Training Facility, White Sands Test Facility, *and other JSC operating locations that may be determined subsequent to contract award.*

AR at 8180 (emphasis added).  Plaintiff contends "NASA's internal document is clear that the language of 'other NASA operating locations or alternate work locations' in the DASS SOW refers

---

[43] In its briefs, Plaintiff also notes that (1) the DASS SOW title specifically references JSC and SSC; (2) the DASS contract is referenced as a "dual" contract; and (3) during Q&A regarding the contract, NASA discussed only SSC and JSC Space Centers. Pl. MJAR at 11–12. These considerations are resolved in favor of Defendant for the same reasons stated in this Section II.

to additional locations under the operational control of JSC." Plaintiff's Supplemental Motion for Judgment on the Administrative Record (ECF No. 22) (Pl. Suppl. MJAR) at 5. Defendant responds with two arguments. First, Defendant notes the "JSC services were being consolidated with SSC services" and "SSC was the buying location." Def. Mot. Dismiss at 28. As a result, Defendant notes that the plan specifically identified "other JSC operating locations" to make clear these locations were included in DASS, but the statement "does not mean, however, that 'other NASA operating locations or other alternate work spaces' in the solicitation refers only to JSC operating locations." *Id.* Second, Defendant noted that the date of the Master Buy Plan was June 2019, while the Solicitation was published in February 2020. *Id.* Thus, "the solicitation contemplates MAP's goal of consolidating services for multiple centers under a single contract to conserve resources and funds" and, "if anything, the change in wording from the plan to the solicitation supports the position that 'other NASA operating locations' includes other space centers." *Id.* (citing AR at 839).

The Court requested Defendant file a Notice detailing whether the locations identified in Section 1.3, apart from SSC and JSC, are the only locations NASA has supporting JSC. Oral. Arg. Tr. at 64:10–12. In its Notice, Defendant provided:

> Yes. The JSC Contracting Officer has verified that the locations identified in Section 1.3 of the RFP are the only locations supported by JSC, "Johnson Space Center (JSC) (including Government maintained facilities in the immediate JSC area (including the Sonny Carter Training Facility and Ellington Field)), [and] the White Sands Test Facility located in Las Cruces, New Mexico." There is a NASA Forward Operation Location in El Paso, Texas, but it is not considered to be supported by JSC because it is a leased hanger at the El Paso International Airport.

Defendant's Response to the Court's Questions Posed at Oral Argument (ECF No. 29) (Def. Notice) at 1. Defendant's Notice affords further credence to the Defendant's argument that the phrase "other operating locations" is not restricted merely to other JSC locations (because there

are no others), but instead includes other locations more generally, including Space Centers.

In addition to the arguments above, the administrative record also amply supports that NASA conducted and documented an analysis to determine if the proposed modification to the DASS contract triggered CICA.  AR at 887–89; 890–92.  Though it is the Court's duty to determine whether Defendant acted in an arbitrary and capricious manner or contrary to law, the Court notes that NASA conducted a thorough, well-reasoned analysis to make its determination.  "Effective contracting demands broad discretion."  *Ian, Evan & Alexander Corp.*, 136 Fed. Cl. at 411 (citing *Burroughs Corp. v. United States*, 617 F.2d 590, 598 (Ct. Cl. 1980); *Sperry Flight Sys. Div. v. United States*, 548 F.2d 915, 921 (Ct. Cl. 1977)).  As the Court has done here, NASA also considered "if, prior to award, the solicitation adequately advised offerors of the potential for the change or offerors reasonably could have anticipated this type of contract change based upon what was in the solicitation."  AR at 888; *see also* AR at 887–89; 890–92.  In its analysis, NASA identified and relied on Section 1.0 of the DASS SOW and Section 1.3 of the DASS RFP.  NASA explained "[t]he DASS solicitation notified offerors that they shall provide administrative support services, if required, to other NASA locations."  AR at 888, 891.

As noted, it is not for the Court to substitute its own judgment for that of the agency. Instead, where the Court finds a reasonable basis for NASA's action, "the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations."  *Weeks Marine,* 575 F.3d at 1371 (quoting *Honeywell*, 870 F.2d at 648). As Defendant aptly explained at Oral Argument: "[I]n order for CeleraPro to succeed, [the Court] would have to find that NASA's place of performance, which is identified as 'other NASA operating locations or alternate work locations not currently specified,' does not include space centers."  Oral Arg. Tr. at 47:18–22.  Defendant

describes its position as "a rational and reasonable reading."  Oral Arg. Tr. at 51:13.  Upon review of the administrative record, this Court agrees.  Indeed, the plain language of the Solicitation is consistent with NASA's MAP, which requires the centralization of administrative support services at the agency level to improve efficiency, cost effectiveness, and consistency across NASA locations.  AR at 9306.  Moreover, several offeror proposals demonstrate a general offeror understanding that the DASS contract was meant to support "multiple geographic locations," which comfortably includes locations other than JSC and SSC.  Lastly, the Master Buy Plan Plaintiff cites for support was authored several months in advance of the DASS Solicitation itself.  *See* AR at 8180, 8192.  To that end, and as Section 1.3 of the DASS RFP explicitly references all JSC locations, Plaintiff's argument that "other locations" references only JSC locations is not supported by evidence in the administrative record.  *See generally* Def. Notice.  Instead, the administrative record clearly supports that the DASS contract reasonably informed offerors of the potential for NASA locations aside from JSC and SSC, "of a nature which potential offerors would reasonably have anticipated."  *Tetra Tech, Inc. v. United States*, 131 Fed. Cl. 653, 662 (2017) (quoting *AT&T Commc'ns*, 1 F.3d at 1207 (quoting *Neil R. Gross & Co.,* 90–1 CPD ¶ 212 at 3 (1990))).

> **B.** **The Task Order at Issue Does Not Substantially Change the Cost of the DASS Contract**

As noted, when analyzing a CICA claim, the Court also considers whether the modification "substantially changes the type of work, performance period, and costs as between the original contract and the modified contract." [44]  *Portfolio Disposition Mgmt. Grp.*, 64 Fed. Cl. at 12 (citing

---

[44] As previously noted, the parties do not dispute the test set forth by the Court under CICA.  Pl. MJAR at 10–11 ("This Court has adopted the rule that when 'determining whether a modification materially departs from the scope of the original procurement, a court should consider: (1) whether the modification is of a nature which potential offerors would reasonably have anticipated; and (2)

*Cardinal Maint. Serv.*, 63 Fed. Cl. at 106 (citations omitted)).  In the present action, the parties

agree that the type of work and performance period are not at issue.[45]  Pl. MJAR at 7 ("The type

of work and labor categories under the CASS II Contract are the same as under the DASS

Contract."); Oral Arg. Tr. at 38:17–20 ("[I]t would be disingenuous to argue that the type of work

is outside the scope.  These contracts all have the same . . . labor categories."); Def. Mot. Dismiss

at 24 (quoting Pl. MJAR at 7) ("As CeleraPro concedes, 'the type of work and labor categories

under the CASS II Contract are the same as under the DASS contract.'  Both are contracts for the

identical administrative support services."); *see generally* Pl. MJAR (exhibiting that Plaintiff never

raises performance period in its arguments).  Accordingly, the Court need only address the cost

factor here.

        Although the parties agree change in cost is a relevant consideration, the parties disagree

about how to calculate that change and whether the change in cost is so significant as to constitute

---

whether the modification substantially changes the type of work, performance period, and costs as
between the original contract and the modified contract.") (internal citations omitted); *see* Def.
Mot. Dismiss at 14, 23–36 (contending that "DASS offerors were on notice" and arguing that the
modification does not substantially change the cost of the DASS contract).  The administrative
record also demonstrates that NASA used the same considerations in its own scope determinations
of the DASS contract.  AR at 887–89, 890–92.

[45] Plaintiff raised a magnitude argument for the first time at Oral Argument.  Although Plaintiff
initially analogized costs and magnitude as synonymous during Oral Argument, Plaintiff later
appeared to separate the two.   This Court understands Plaintiff's references to the term
"magnitude" at Oral Argument to be synonymous with cost arguments that Plaintiff makes in its
briefs.  Accordingly, to the extent Plaintiff intends for its references regarding magnitude to be
separate from costs, these arguments, absent from its briefs, are waived.  *See Elec. Welfare Trust
Fund v. United States*, 167 Fed. Cl. 174, 179 (2023) (citations omitted); Oral Arg. Tr. at 38:12–25
(The Court: "Within . . . your scope argument, do you agree that the type of work and the
performance period are really not at issue here? What we're really talking about is cost."  Plaintiff:
"We're talking about magnitude, yes, Your Honor. I mean, it would be disingenuous to argue that
the type of work is outside of the scope. These contracts all have the same -- they all have the same
labor categories. It's really a – it's a new order of magnitude."  The Court: "So not performance
period, not type of work. We're just talking really about the cost?" Plaintiff: "Yeah. Yes, Your
Honor, the cost and the magnitude.").

a "substantial change."

By way of background, the original – and current – ceiling of the DASS contract is $76 million.  AR at 892; *see also* AR at 8196 ("The maximum value that can be ordered under this contract is $76,000,000.").  The administrative record reflects that as of NASA's March 2, 2023 KSC Scope Determination, only $34.2 million of the $76 million DASS contract ceiling had been allotted, and that NASA does not intend to increase the ceiling amount.  AR at 890–92; Def. Mot. Dismiss at 35 (noting dollar value of services ordered under DASS contract as of MJAR briefing date is approximately $42 million and that "NASA can still spend $34 million under DASS before the vehicle ceases").  At Oral Argument, NASA noted that the ceiling value of the contract contemplates that NASA was "always expecting to add the additional space centers" to the DASS contract, and left room in the DASS contract to do so.  Oral Arg. Tr. at 24:13–25:5; 47:2–7; 52:17–54:24.  The administrative record reflects that the proposed modification related to the addition of MSFC administrative support services to the DASS contract has a proposed value of $9,957,042, and that the performance period was expected to span from August 2023 through October 2025, with a two-month phase-in period in June and July 2023.  AR at 891.  It is undisputed that the addition of a $9.9 million modification falls well within the DASS contract's $76 million ceiling, and there is no contrary evidence in the record.  *See* AR at 892 (noting current balance and expected Year 4 and Year 5 expenditures under the DASS contract).

Plaintiff argues the proper calculation is to compare the cost of the proposed task order with the actual value[46] of the current task orders under the IDIQ contract, ranging from a nearly

---

[46] Plaintiff proposes that this Court should consider the increase to the DASS contract for the addition of the KSC task order along with the $9.9 million increase in cost under the proposed MSFC task order, to calculate a total increase in cost of $30 million.  Pl. MJAR at 8–9, 12; Pl. Response at 7.  Plaintiff contends that this increased the dollar scope of the contract by 55 percent "based on the sums actually incurred by the DASS Contract, not the ceiling amount used by the Agency."  Pl. MJAR at 12.   Separately, Plaintiff also contends that a proposed MSFC

24 percent to a 55 percent increase in cost value.[47]  Plaintiff also argues the modification of DASS to include KSC is relevant to its cost argument.[48]  Pl. MJAR at 5–6, 8–9, 12; Pl. Response at 7.  In contrast, Defendant argues the change in cost should be based on the cost of the proposed task order compared to the IDIQ contract (DASS) ceiling value, reflecting a 13 percent cost change. Def. Mot. Dismiss at 33–36.

The core of Defendant's argument regarding costs is that Plaintiff misunderstands the nature of IDIQ contracts.  Def. Mot. Dismiss at 33–36.  According to Defendant, in making the consolidation decision at issue, NASA prospectively estimated the total required dollar amount for administrative support services at MSFC ($9,957,042) and compared this amount to the dollar value of services remaining on the DASS contract.  *Id.*; *see* AR at 890–92.  The agency estimated that amount by taking into account the contract's ceiling amount less the value of the other three centers currently serviced under the contract (SSC, JSC, KSC).  Def. Mot. Dismiss at 33. Defendant argues this approach is proper because IDIQ contracts are fundamentally meant to be flexible contract vehicles that provide an indefinite quantity of supplies or services during a prescribed period, with task orders issued for particular performance requirements.  *See id.* at 34. Further, Defendant notes a "14 [percent] or $1.1 million in cost savings on the MFSC requirement

_____

administrative services task order under DASS alone will "add almost 24%" to the cost.  *Id.* at 9.

[47] By "actual value," CeleraPro means the amount actually committed to task orders that have already been issued under the DASS contract.  CeleraPro cites very little authority for its "actual value" argument, providing only a general citation referencing IDIQ contracts.  Pl. MJAR at 12 ("*See* FAR 16.504").

[48] Defendant also notes that because Plaintiff lumps the KSC and MSFC consolidations together in its "substantial change" argument, Plaintiff has "conceded" that the addition of the MSFC alone does not constitute a substantial change.  Plaintiff does not concede this.  Pl. MJAR 5–6 ("The plan to add support at Marshall Space Flight Center ("MSFC") alone is outside of the scope of the original DASS scope of work ("SOW").  However, when viewed in combination with the previous sole source additions to the DASS Contract, it is clear that NASA's actions have violated CICA's mandate that new opportunities be subject to competitive bid.").

due to the consolidation." *Id.* at 33 (citing AR at 905).

Though not binding, *Seventh Dimension, LLC v. United States*, which discusses IDIQ contracts in the context of cardinal changes to address scope, is instructive. 160 Fed. Cl. at 32.  In that case, the court explained "that particularly under a 'flexible' contract — like an IDIQ vehicle," changes "that do not significantly alter the 'overall purpose and nature of the original contract' are not cardinal changes." *Id.* (quoting *Everpure, Inc.*, B-226395, 90-2 CPD ¶ 275, 1990 WL 278656, at *3 (Comp. Gen. Oct. 10, 1990)).  Thus, "[i]n cases that apply the cardinal change doctrine, even a substantial price increase alone is not enough to establish that modifications are beyond the scope of a contract, as long as the nature and purpose of the contract has not changed." *Am. Apparel, Inc. v. United States*, 108 Fed. Cl. 11, 38 (2012) (citing *S.J. Groves & Sons Co. v. United* States, 661 F.2d 170, 173 (Ct. Cl. 1981); *Def. Sys. Grp.*, B240295, 1990 WL 293536, at *4 (Comp. Gen. Nov. 6, 1990)) ("We recognize that the substantial cost of the modifications, here representing more than a 120 percent increase in price, can provide evidence of a cardinal change. However, where, as here, it is clear that the nature and purpose of the contract have not changed, a substantial price increase alone does not establish that the modifications are beyond the scope of the original contract.").  Thus, "even substantial increases in cost do not inexorably compel a conclusion that a contract has been modified outside its original scope." *Seventh Dimension,* 160 Fed. Cl. at 32 (quoting *DOR Biodefense, Inc.*, B-296358.3, 2006 CPD ¶ 35, 2006 WL 279311, at *7 (Comp. Gen. Jan. 31, 2006)).  Put simply, "there is no mechanical or arithmetical answer." *Ian, Evan & Alexander Corp.*, 136 Fed. Cl. at 416 (internal citations omitted).

The Federal Circuit has not yet set forth a standard for the proper assessment of change in costs in CICA claims regarding IDIQ contracts.  However, in analyzing the change in costs factor under either Plaintiff or Defendant's proposed cost calculation, it is evident that the "nature and

purpose of the contract has not changed." *Am. Apparel*, 108 Fed. Cl. at 38 (citing *S.J. Groves & Sons Co.*, 661 F.2d at 173; *Def. Sys. Grp.,* B240295, 1990 WL 293536, at *4).   NASA has consistently, over the period of several years, documented its intent to consolidate its administrative support services in support of MAP.   *See supra* Section I.   For example, NASA's MSFC Consolidation Determination expressly provides "[t]he DASS solicitation and contract were structured to implement NASA's MAP plan to transform all mission support services from their current state to an enterprise operating model while maintaining mission focus, improving efficiency, ensuring local authority, and valuing the workforce."   AR at 906; *see also* AR at 901–10.   The nature and purpose of the DASS contract to provide administrative support services to NASA locations remains unchanged.   *See Am. Apparel*, 108 Fed. Cl. at 38.   In this case, change in cost alone, under either party's proposed calculation, does not constitute a substantial change.   This is particularly true where, as here, there is no change to the type of work or performance period. *See Seventh Dimension,* 160 Fed. Cl. at 32.

Further, as reflected in the administrative record, NASA conducted and documented a thorough analysis of whether proposed modifications to the DASS contract, including costs, triggered CICA.   AR at 887–89; 890–92.   As required in analyzing CICA scope issues, NASA considered whether "there [was] a material difference between the modified contract and the contract that was originally awarded."   AR at 888; *see also* AR at 887–89, 890–92.   Additionally, as required by law, NASA, like this Court, fully considered "the type of work, performance period, and the cost between the contract as awarded and modified."   AR at 888, 891.   NASA estimated change in cost by comparing the proposed modification to the ceiling of the DASS contract before ultimately concluding "the contract change is within the general scope of the original contract." AR at 889, 892.

Finally, the proposed $9,957,042 increase in costs from 2023 through 2025 under the DASS contract would still fall well-within the contract's $76 million cost ceiling.  *See* AR 890–92.  Though not dispositive, that the change in cost would still be under the DASS contract's cost ceiling as originally contemplated further buttresses Defendant's contention that NASA had always contemplated the future addition of Space Center locations under DASS.  *See* Oral Arg. Tr. at 24:13–25:5.

Considering all such evidence in the administrative record and arguments above regarding the potential increase in costs at issue, the potential cost savings on the MSFC requirement due to consolidation, that the nature and purpose of the contract remains unchanged, and that it is undisputed no significant changes to type of work and performance period in the DASS contract exist, it is evident that NASA's determination regarding costs is reasonable.[49]  *See, e.g.*, AR at 890–92, 901–10.  *See Seventh Dimension,* 160 Fed. Cl. at 32 (quoting *Everpure, Inc.*, B-226395, 90-2 CPD ¶ 275, 1990 WL 278656, at *3 (Comp. Gen. Oct. 10, 1990)); *see id.* (quoting *DOR Biodefense, Inc.*, B-296358.3, 2006 CPD ¶ 35, 2006 WL 279311, at *7 (Comp. Gen. Jan. 31, 2006)); *Am. Apparel*, 108 Fed. Cl. at 38 (citing *S.J. Groves & Sons Co.*, 661 F.2d at 173; *Def. Sys. Grp.*, B240295, 1990 WL 293536, at *4 (Comp. Gen. Nov. 6, 1990)); *Ian, Evan & Alexander Corp.*, 136 Fed. Cl. at 416 (internal citations omitted).  Therefore, NASA's decision to modify DASS to include other Space Centers is not arbitrary, capricious, or contrary to law on this basis as well.

---

[49] Although type of work and performance period are not in dispute in this matter, NASA's analysis regarding these considerations was also reasonable.  AR at 887–89 (demonstrating NASA engaged in an analysis regarding the type of work by comparing the administrative services performed under DASS and the services of the proposed modification; demonstrating NASA found the proposed period of performance to be within the period of performance of the DASS contract as awarded); 890–92 (same); *see also supra* Section II(B) (noting that type of work and performance period are not in dispute and citing portions of the parties' briefing and Oral Argument).

\* \* \* \* \*

In summary, whether an agency has violated CICA's competitive procedures turns on whether the "modification of an existing contract requires a new competition or falls within the scope of the original competitive procurement." *AT&T Commc'ns*, 1 F.3d at 1204–05. This Court has considered: "(1) whether the modification is of a nature which potential offerors would reasonably have anticipated; and (2) whether the modification substantially changes the type of work, performance period, and costs as between the original contract and the modified contract." *Portfolio Disposition Mgmt. Grp.*, 64 Fed. Cl. at 12 (citing *Cardinal Maint. Serv.,* 63 Fed. Cl. at 106 (citations omitted)); *Timberline Helicopters*, 140 Fed. Cl. at 623 (quoting the two considerations); *Ian, Evan & Alexander Corp.*, 136 Fed. Cl. at 416 (same); *AT&T Commc'ns*, 1 F.3d at 1205. After considering the parties' arguments and upon review of the administrative record, the Court finds both considerations are resolved in Defendant's favor. Accordingly, considering this Court's narrow review of such bid protests, the discretion afforded to agencies, and the administrative record here, this Court finds Defendant's actions were reasonable and well-within the bounds of the law. *See Co-Steel Raritan*, 357 F.3d at 1309; *Weeks Marine,* 575 F.3d at 1371.

## <u>CONCLUSION</u>

For the reasons set forth above, this Court **DENIES** Defendant's Motion to Dismiss (ECF No. 25), **DENIES** Plaintiff's Motion for Judgment on the Administrative Record (ECF No. 11), and **GRANTS** Defendant's Cross-Motion for Judgment on the Administrative Record (ECF No. 25).

The parties are directed to **CONFER** and **FILE** a Notice within seven days of this Memorandum and Order, attaching a proposed public version of this Memorandum and Order, with any competition-sensitive or otherwise protected information redacted.

The Clerk of Court is **DIRECTED** to enter Judgment accordingly.


IT IS SO ORDERED.



*Eleni M. Roumel*
ELENI M. ROUMEL
Judge

November 3, 2023
Washington, D.C.